

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 10, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **CASE NO. 23-30035-MVL7** |
| **ANIMO SERVICES, LLC,** | § | **(CHAPTER 7)** |
| | § | |
| Debtor. | § | |
| | § | |
| **AREYA HOLDER AURZADA,** | § | |
| **TRUSTEE,** | § | |
| | § | **ADVERSARY NO. 25-03021-MVL** |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **UNQORK, INC.** | § | **RELATED TO ECF NO. 26** |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

## I.   INTRODUCTION

Before the Court is the *Motion to Dismiss the First Amended Complaint* and *Brief in Support* (collectively, the "**Motion to Dismiss**") filed by Defendant Unqork, Inc. ("**Unqork**" or the "**Defendant**") on September 19, 2025 [ECF Nos. 26, 27]. In the Motion, the Defendant seeks to have the Court dismiss all of the causes of action alleged by Plaintiff Areya Holder Aurzada—the duly appointed Chapter 7 Trustee (the "**Trustee**" or the "**Plaintiff**")—in the *Plaintiff's First Amended Complaint* (the "**Complaint**") filed on August 11, 2025 [ECF No. 25].

In response to the Motion to Dismiss, the Trustee filed an *Objection to Defendant's Motion to Dismiss Trustee's First Amended Complaint* and a *Brief in Response* (collectively, the "**Response**") on October 27, 2025 [ECF Nos. 31, 32]. The Defendant filed a *Reply Brief in Support of Defendant Unqork Inc.'s Motion to Dismiss the First Amended Complaint* (the "**Reply**") on November 13, 2025 [ECF No. 33].

The Court held a hearing on the Motion to Dismiss on November 25, 2025. Counsel for the Trustee and Unqork appeared. After hearing arguments, the Court took the Motion to Dismiss under advisement. The Court has considered the briefing and arguments of counsel and concludes that the Motion to Dismiss should be DENIED. The following constitutes the Court's analysis underlying its ruling.

## II.   JURISDICTION

Bankruptcy subject matter jurisdiction exists to determine this motion pursuant to 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### III.    FACTUAL AND PROCEDURAL BACKGROUND

#### A. Factual History[1]

The matter before the Court primarily revolves around the contractual relationship between Unqork and Animo Services, LLC ("**Animo**" or the "**Debtor**"), and the eventual fallout between the parties in connection with a Master Software as a Service (Saas) Agreement (the "**MSA**") signed on August 9, 2021. As noted by the Trustee in the Complaint, Animo is an affiliate of With Purpose, Inc. ("**WPI**")—an "umbrella" of connected entities doing business under the name "GloriFi". ECF No. 25 at 4. At its core, GloriFi, founded by Toby Neugebauer ("**Mr. Neugebauer**"), was a finance technology startup that sought to develop and provide financial services and products to a politically conservative customer base. *Id.* These services and products were to include checking and savings accounts, credit cards, brokerage accounts, and insurance policies, among others. *Id.* To meet its goals, GloriFi needed to develop an "integrated proprietary software system" (the "**Tech Stack**") that would provide necessary "customer-facing components", such as a GloriFi app and website. *Id.* Moreover, GloriFi intended to launch its fully developed Tech Stack by March 31, 2022.

To facilitate development of the Tech Stack and launch its app and website on time, GloriFi entered into negotiations with Unqork. According to the Trustee, Unqork provides "products and services to companies that build apps and software," namely a "no-code platform" that permits Unqork's customers to "build custom applications using visual interfaces and templates" rather than writing code (the "**Unqork Platform**"). *Id.* at 4–5. The Trustee alleges that Unqork claimed it could develop its customers' respective applications and get them to market three times faster

---

[1] For purposes of this Order, the factual background is based upon the facts contained in the Complaint, which the Court accepts as true for purposes of the Motion to Dismiss in accordance with established authority.

than its competitors, while doing so at a third of the cost. *See Id.* at 5. Moreover, Unqork marketed itself as being able to deliver customer applications with "99.9% Uptime" and "600x [f]ewer defects." *Id.* Accordingly, Animo and Unqork entered into the MSA on August 9, 2021. The MSA further stated that the "services, deliverables, and work product" that Unqork would be providing would be detailed further in a Statement of Work (the "**SOW**"), which was also executed by the parties on August 9, 2021. *Id.*

Pursuant to the SOW, Unqork was obligated to build and provide two features of the Tech Stack: (1) a "customer-facing interface" to allow GloriFi customers to onboard onto GloriFi's app, providing them access to GloriFi's banking, insurance, and mortgage products; and (2) a "core backend technology" that allowed GloriFi's customers to purchase homeowners' insurance policies (collectively, the "**Unqork Products**"). *Id.* at 5–6. The SOW further provided that Unqork had committed to launching the "first phase" of the Unqork Products to the public by January 1, 2022. *Id.* at 6. The Trustee further alleges that GloriFi's ability to launch its app on time and provide the Unqork Products to its customer base "depended upon Unqork making good on its representations and providing reasonably equivalent value for the substantial transfers the Debtor made to Unqork." *Id.* at 7.

Despite the relatively straightforward contractual obligations, the Trustee alleges that Unqork began gradually selling Animo additional products that Animo neither needed nor would ever use. First, on or about August 13, 2021, the parties executed Order No. 001 ("**Order 1**"), wherein Unqork charged Animo for access to the Unqork Platform where Unqork was developing the products detailed in the MSA. *Id.* at 8. Pursuant to Order 1, Animo subscribed to the Unqork Platform for a three-year term, totaling approximately $2.1 million in escalating subscription fees. *Id.* at 7–8. Not only were the subscription fees prepaid by Animo, but the Trustee also alleges that

Unqork was supposed to provide three digital "environments" in exchange, each of which functioning as a digital space and allowing for the Unqork Products to be developed, tested, and, eventually, housed post-launch. *Id.* at 8. Moreover, Unqork also sold Animo a support package, which would provide technical support to all personnel using the Unqork Platform to build the Unqork Products. *Id.* According to the Trustee, Animo was required to prepay Unqork 10% of the above-mentioned subscription fees, totaling $45,000 during the first year of the subscription. *Id.* at 9.

However, it "quickly became obvious that Unqork was behind schedule, unprepared, and ill-equipped" to deliver the Unqork Products in or around September 2021. *Id.* According to the Trustee, despite these "failures", Unqork invoiced Animo seven (7) times between September 2021 and December 2021, totaling approximately $1.3 million in invoiced fees. *Id.* at 10–11. In response to the invoices, Animo made five payments on December 17, 2021, and an additional payment on January 18, 2022, in response to a January 11, 2022, invoice from Unqork regarding same. *Id.* at 12.

During this period of time, the Trustee alleges that Animo was "forced" to decrease Unqork's scope of work and responsibilities via a Change Order ("**Change Order 1**"), narrowing the Defendant's focus strictly to development and testing of GloriFi's insurance products. *Id.* However, on or about January 21, 2022, Animo and Unqork executed a second Change Order ("**Change Order 2**") that amended the scope of the SOW, to increase the total cost to $3,892,400, and amend the completion deadline for the Unqork Products to May 25, 2022, with an anticipated launch date of April 1, 2022. *Id.* Finally, Change Order 2 included twenty-six (26) specific features that Unqork was required to build, test, and deliver as part of the launch for GloriFi's insurance products. *Id.* at 12–15.

The parties continued their back and forth with respect to invoices and payments in response to same from January 2022 through April 8, 2022. *Id.* at 16. On May 3, 2022, however, Animo discovered that the features designed by Unqork with respect to the insurance products did not work, leading a senior member of Animo to conclude that Unqork "break[s] as much as they fix." *Id.* at 17. Furthermore, Animo's team discovered twenty "major" bugs in the Unqork Products related to GloriFi's insurance products within ten days of the May 25th launch date. *Id.* According to the Trustee, by the May 25th deadline, Unqork had "barely completed pre-testing development" of less than half of the 26 features Unqork had been contracted to develop pursuant to Change Order 2. *Id.* at 17–18. In response, on June 7, 2022, Animo sent Unqork a Notice of Termination of the MSA, the SOW, and the remaining Change Orders. *Id.* at 18. Attached to the Notice of Termination was an itemized list of the Unqork Products and their respective completion statuses, most of which, if not all, had not been completed by May 25th. *Id.* at 18–21.

Additionally, the Trustee alleges that Animo was financially vulnerable throughout its entire relationship with Unqork. *See id.* at 21. According to the Trustee, within months of the MSA's execution, Animo's Chief Financial Officer, Jonathan Pennington ("**Mr. Pennington**"), indicated on December 3, 2021, that WPI would be transferring $3 million to Animo in order to "cover anticipated expenses and payroll" through the month. *Id.* at 21–22. Shortly after this cash infusion, Animo made a December 17th payment to Unqork in relation to an invoice sent by the Defendant. The Trustee not only alleges that the December 17th payment placed Animo in "further financial distress", but that, three days later, Mr. Pennington internally circulated a year-to-date income statement for Animo that reflected a net loss of $9,939,502, and a WPI balance sheet that indicated Animo's parent company was also financially vulnerable, with total liabilities of approximately $53 million exceeding its total assets of approximately $52 million. *Id.* at 22.

According to the Trustee, WPI's financial distress only continued to increase in January 2022, and that Mr. Pennington even acknowledged on January 10, 2022, that both Animo and WPI would be in a "no-revenue phase" until approximately April 2022. *Id.* Despite not having sufficient funds on hand without a cash infusion from WPI to make payroll as well as pay ongoing expenses, Animo continued to make payments to Unqork through January 2022 and much of February 2022. *Id*. at 23.

The Trustee further alleges that both Animo and WPI had much bigger insolvency and/or financial vulnerability issues than it may have initially seemed. As of November 20, 2021, Animo had total assets of approximately $991,000—approximately $770,000 of which was "Software in Process"—as compared to total liabilities of approximately $1.1 million. *Id.* Excluding the "Software in Process" assets, on December 31, 2021, and on February 15, 2022, Animo reported assets of approximately $2.4 million and liabilities of approximately $4.4 million, nearly all of which were monies owed to unsecured vendors. *Id.* at 24. As of December 31, 2021, WPI's balance sheet reflected approximately $52 million in assets and approximately $54 million in liabilities, all while Unqork "continued to get paid." *Id.*

According to the Trustee, Animo's financial situation only became more dire in March 2022, as emails circulated between Animo and WPI, reflecting that Animo was facing a "liquidity crisis" that would require "urgent" capital infusions to satisfy what were predominantly unpaid invoices belonging to Animo, totaling approximately $3.3 million in outstanding fees. *Id.* at 24–26. Additionally, a "Balance Sheet Reconciliation Package" circulated internally showed that Animo and WPI were both balance sheet insolvent by approximately $488,000 and $1.9 million, respectively, on March 31, 2022, but that Animo had nevertheless made another payment of approximately $475,000 to Unqork on March 29, 2022. *Id.* at 26. Payments related to Unqork's

invoices continued up through April 8, 2022, at a time when Animo only had $297,000 in cash and outstanding liabilities of approximately $3.1 million. *Id*. at 27.

In sum, the Trustee alleges that Animo paid Unqork approximately $2.9 million in fees in exchange for no real value to the Debtor at all, let alone reasonably equivalent value, during any of the points in time in which a transfer of funds occurred. *Id*. at 27–28.

### B. Procedural History

In the Complaint, the Trustee alleges five causes of action: (1) Avoidance of Fraudulent Transfer pursuant to § 548(a)(1)(B) of the Bankruptcy Code; (2) Avoidance of Fraudulent Transfer pursuant to § 24.005 of the Texas Uniform Fraudulent Transfers Act ("**TUFTA**"); (3) Recovery of Voidable Transfer pursuant to § 550 of the Bankruptcy Code; (4) Disallowance of Claim pursuant to § 502 of the Bankruptcy Code; and (5) Pre-Judgment Interest, Attorneys' Fees, and Expenses. ECF No. 25 at 29-34.

### IV.   STANDARD OF REVIEW

#### A. Rule 12(b)(6)

Rule 12(b)(6), incorporated by Rule 7012(b) of the Federal Rules of Bankruptcy (the "**Bankruptcy Rules**"), authorizes dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded facts as true, and view them in the light most favorable to the plaintiff. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (quoting *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir. 1986)). However, the Court need not "strain to find inferences favorable to the plaintiffs." *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations, which, if accepted as true, state a plausible cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim satisfies the plausibility test 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ, 2021 WL 2546664, at *1 (Bankr. N.D. Tex. June 3, 2022) (Jones, J.). This plausibility requirement sits somewhere between possible and probable, and is satisfied where the plaintiff's pleaded facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678

Although the complaint is not required to provide detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. However, numerous courts within the Fifth Circuit have reiterated that because "a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely granted." *Reagor-Dykes*, 2021 WL 2546664 at *2 (citation omitted). In reviewing the motion, the court looks to the pleadings, alongside any documents attached or incorporated into the complaint by reference. *See Mirant Corp. v. Southern Co.*, 337 B.R. 107, 115 (N.D. Tex. 2006).

## V.    LEGAL ANALYSIS

The dispositive issues before the Court in this matter are twofold: (1) whether the Trustee has sufficiently pleaded either the insolvency and/or financial vulnerability of the Debtor at the time of the transfers to Unqork; and (2) whether the Trustee has sufficiently pleaded that Unqork did not provide reasonably equivalent value via its services and/or the Unqork Products in

exchange for the approximately $2.9 million transferred by the Debtor. The Court will address these issues in turn.

### A. Insolvency/Financial Vulnerability

Pursuant to § 548 of the Bankruptcy Code, a transfer may be deemed constructively fraudulent if the debtor:

(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)  (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B)(i)–(ii). Accordingly, a trustee in bankruptcy may avoid a constructively fraudulent transfer under § 548(a) of the Bankruptcy Code if:

[T]he transfer was of an interest of the debtor in property; (2) the transfer was made or incurred on or within two years before the date of filing of the petition; (3) the debtor voluntarily or involuntarily received less than reasonably equivalent value in exchange for such transfer or obligation; and (4) the debtor was in a financially vulnerable position.

*In re With Purpose, Inc.,* Case No. 23-30246, Adv. Proc. No. 24-3038, 2025 WL 1698694, at *20 (Bankr. N.D. Tex. June 16, 2025).

A trustee may also assert its "strong arm" powers pursuant to § 544 of the Bankruptcy Code and "avoid any transfer of an interest in the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1). Under § 24.005(a)(2) of TUFTA, a transfer is considered fraudulent as to a creditor if the debtor made the transfer:

[W]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a

transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Comm. Code § 24.005(a)(2)(A)–(B). Accordingly, the trustee may invoke § 24.005(a)(2) to avoid a constructive fraudulent transfer if: (1) the debtor transferred an interest in property; (2) without receiving reasonably equivalent value in exchange for the transfer; and (3) while the debtor was in a financially vulnerable position. *With Purpose,* 2025 WL 1698694 at *20.

Unqork's first argument in support of its Motion to Dismiss is that the Trustee has not plausibly alleged either insolvency or financial vulnerability under Counts I and II, and thus the entirety of the Complaint should be dismissed.[2] Unqork acknowledges that under both § 548 and TUFTA, the Trustee must allege that the Debtor was either engaged in business for which its remaining capital was unreasonably small, or that the Debtor intended to or believed it would incur debts beyond its ability to pay. ECF No. 27 at 8. However, Unqork additionally notes that under § 548, the Trustee can alternatively allege that the Debtor was insolvent on the date of each transfer in question or as a result of same. *Id.* (quoting *With Purpose*, 2025 WL 1698694 at *20). Therefore, the Court will address Unqork's arguments with respect to both insolvency and financial vulnerability in turn.

   *i.   Insolvency*

As this Court held in *With Purpose*, a corporate debtor is insolvent when its financial condition is such that the sum of its debts is greater than all of its property, at a fair valuation. 2025 WL 1698694, at *14 (relying on 11 U.S.C. § 101(32)). In what has generally been referred to as the "balance sheet test", courts will typically assess the "fair valuation" of the assets and liabilities

---

[2] As noted by the Defendant, Counts III, IV, and V are dependent upon the viability of Counts I and II, and therefore all of the causes of action should be dismissed if the Court were to grant the Motion to Dismiss as to Counts I and II.

included on a debtor's balance sheet, as required by the Bankruptcy Code. *With Purpose*, 2025 WL 1698694 at *14. Moreover, the Fifth Circuit has previously articulated that:

> Fair valuation may not be equivalent to the values assigned on a balance sheet. Financial statements reflect the book value of assets, ordinarily the cost of the property reduced by accumulated depreciation. The rate of depreciation is usually the maximum allowed by income tax regulations. The fair value of property is not determined by asking how fast or by how much it has been depreciated on the corporate books, but by "estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions."

*Matter of Lamar Haddox Contractor, Inc*., 40 F.3d 118, 121 (5th Cir. 1994) (quoting *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*, 124 B.R. 398, 402 (Bankr. S.D. Fla. 1991)).

Likewise, § 24.003(a) of TUFTA similarly defines insolvency as a situation when "the sum of the debtor's assets is greater than all of the debtor's assets at a fair valuation." Tex. Bus. & Comm. Code § 24.003(a); *see In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 737 (Bankr. S.D. Tex. 2020); *In re Pace*, 456 B.R. 253, 273 (Bankr. W.D. Tex. 2011).

However, at the motion to dismiss stage, what is required to sufficiently plead a debtor's insolvency at the time of the transfers in dispute is a distinct question. "[C]omplaints that identify the dates, amounts, source, and transferee of each of the alleged transfers successfully support claims of constructive fraudulent transfer under [Rule 8(a)(2) of the Federal Rules of Civil Procedure]'s pleading standard." *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 456 (Bankr. D. Del. 2018). As articulated in *PennySaver*, a debtor's insolvency is generally a factual determination best left to the discovery process, so long as the trustee has "identified the transfer by date and face amount". *Id.* (citation omitted) (internal quotations omitted).

In *PennySaver*, the court specifically noted that not only was insolvency "highly fact-specific" and largely dependent upon expert testimony or "seasonable appraisals", but that a motion to dismiss regarding same was not a "proper place" to introduce such evidence or expert testimony. *Id.* at 459 (citation omitted) (internal quotations omitted). Rather, the court noted that

the trustee had adequately plead the debtors' insolvency by describing the debtors' "declining financial performance" in comparison to outstanding obligations. *Id.* Conversely, in cases like *Cyr*, the Bankruptcy Court for the Western District of Texas granted a defendant's motion to dismiss where the trustee "presented no allegations regarding the value of [the debtor's] debt relative to the value of [the debtor's] assets at the time the transfers were made, and thus had failed to adequately plead insolvency. *In re Cyr*, 602 B.R. 315, 332 (Bankr. W.D. Tex. 2019).

Unqork contends that the allegations in the Complaint "fail to establish [Animo's] balance sheet insolvency at the time of each Transfer." ECF No. 27 at 9. In support of this argument, Unqork provides an exhaustive, side-by-side comparison of the Trustee's allegations regarding Animo's financial circumstances in relation to each of the four groupings of transfers, as categorized by Unqork, namely: (1) December 17, 2021; (2) January 18, 2022, through February 16, 2022; (3) March 29, 2022; and (4) April 8, 2022. *Id.* at 9–14.

At bottom, the Defendant's arguments as to these various transfers boil down to a relatively simple proposition: despite the numerous points in time alleged by the Trustee in which Animo was plausibly insolvent, the Trustee nevertheless admits that, prior to each of the transfer dates, WPI transferred sufficient funds to **render** Animo solvent at the point in time of each transfer. Taking the December 17th transfer for example, Unqork highlights that, while on November 20, 2021, the Debtor was plausibly insolvent because its liabilities exceeded its assets by approximately $177,000, on December 3, 2021, WPI transferred $3 million to Animo, rendering Animo solvent by approximately $2.8 million. *See id.* at 9. Accordingly, when Animo paid Unqork approximately $689,000 on December 17, 2021, Animo was not insolvent, or rendered insolvent, by virtue of the transfer. *Id.* at 9–10.

Unqork further quibbles with the Trustee's allegations with respect to: (1) the Debtor's income statements showing net losses, which Unqork contends are irrelevant for insolvency purposes; and (2) more importantly, any allegations related to WPI's alleged insolvency. *See id*. at 10–14. Unqork posits WPI's cash infusions into Animo do not plausibly establish Animo's insolvency, but rather establish that Animo had "ready access to significant cash infusions" that were "merely an email away", and therefore Animo could not have plausibly been insolvent during any of the above-mentioned transfer dates. ECF No. 33 at 6–7. Put simply, "fully funded capital call[s]" ultimately serve as evidence of Animo's **solvency**. ECF No. 27 at 12.

In response, the Trustee reiterates the numerous points in time in which Animo and its executive team circulated financial documentation illustrating how the Debtor's liabilities exceeded its assets, and that only through repeated cash infusions by WPI was the Debtor ever able to make the invoice payments to Unqork at all. *See* ECF No. 32 at 15–18. Setting aside whether the numerous cash infusions by WPI were sufficient enough to render Animo solvent at the time of the transfers, the Trustee's argument on this point contains an additional, metatextual layer. As best distilled by the Court, Animo was "completely out of capital to cover its liabilities by the beginning of December 2021." *Id*. at 16–17. Thus, its executive team was forced to continuously request millions in "rescue" funds from WPI to pay Animo's debts, with the implicit understanding that the money would "already [be] spent before it was even received." *Id.* at 16–17. Hence, Animo was never in a position to cover its own liabilities, save for a pattern of cash infusions from WPI, all of which passed through the Debtor's hands and into Unqork's almost simultaneously.

Arguing that the Trustee contorts a "startup's routine funding requests of its parent into an alleged crisis," Unqork contends that the Court cannot "isolate" the affiliated nature of Animo and

WPI; rather, at bottom, Animo always secured the necessary cash to remain balance sheet solvent at the time the transfers to Unqork took place. ECF No. 27 at 16-17; ECF No. 33. at 6–7.

The Court disagrees with Unqork both procedurally and substantively speaking. From a procedural perspective, Unqork is asking the Court to raise the bar for what constitutes a plausible allegation of insolvency far beyond what the Rule 12(b)(6) case law requires. Much like the plaintiff in *PennySaver*, the Trustee provides a detailed accounting of the transfer dates in comparison to the Debtor's alleged balance sheet prior to and following each of the alleged transfers. The Court can readily point to ample instances in which the Trustee describes both the Debtor's "declining financial performance" and its remaining "obligations"—including, at a minimum, financial obligations owed to Unqork. *PennySaver*, 587 B.R. at 459. Despite Unqork's argument to the contrary, the Complaint in this case is completely distinguishable from the allegations in *Cyr*, wherein the trustee presented "no allegations" with respect to the debtor's assets versus its liabilities. *See Cyr*, 602 B.R. at 332. While Unqork may very well be able to address the Trustee's allegations of insolvency using either expert testimony or evidence produced in the discovery process, requiring that level of scrutiny by the Court at this stage is inappropriate.

Likewise, the Court is unwilling to adopt Unqork's framing of what plausibly qualifies as "insolvency" from a substantive standpoint. In essence, Unqork asks this Court to adopt a hyper-specific interpretation of "insolvency" in both time and place with respect to the related transfers. Under Unqork's interpretation, an allegation of insolvency is wholly implausible so long as a debtor—who was indisputably insolvent prior to the very first transfer—becomes temporarily solvent at the exact moment an alleged transfer occurs, even if that same debtor becomes insolvent again soon after.

Here, Unqork does not dispute that on November 20, 2021, the Debtor was insolvent until WPI transferred $3 million to the Debtor on December 3, 2021, two weeks prior to the December 17, 2021 transfer. ECF No. 27 at 9–10. Even assuming, *arguendo*, that Unqork is correct that the Debtor was therefore not insolvent on December 17th, Unqork readily admits that the Debtor was insolvent two weeks later on December 31st. *Id.* at 10. Although the Court does not dispute the principle that, "To prevail on a constructively fraudulent transfer claim, the Trustee must prove insolvency on the date of the transfer," Unqork's position would have the Court affirmatively hold that a trustee cannot allege insolvency based on a debtor's balance sheet immediately preceding and following the date of the transfer. *Northstar*, 616 B.R. at 737. Likewise, it would render a nullity that portion of § 548 and similar state statutes where a debtor is rendered insolvent because of a transfer. *See generally* 11 U.S.C. § 548(b); *see also* Tex. Bus. & Comm. Code § 24.005(b)(9).

"Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other facts or factors from which the ultimately fact of insolvency on the transfer dates must be inferred or presumed." *In re HDD Rotary Sales, LLC*, 499 B.R. 542, 548 (Bankr. S.D. Tex. 2013) (quoting *Hassan v. Middlesex Cnty. Nat. Bank*, 333 F.2d 838, 840 (1st Cir. 1964)) (internal quotations omitted). "Bankruptcy Courts in the Fifth Circuit have inferred debtor insolvency as of the date of the transfer without direct evidence when the relevant transfer occurs between two known insolvency dates." *Id.* at 549.

Although the court in *HDD Rotary Sales* did not ultimately find "insolvency by inference", that case is distinguishable from the current matter in two respects. First, *HDD Rotary Sales* was not a determination made in connection with a motion to dismiss, but rather a post-trial opinion in consideration of expert testimony regarding a debtor's insolvency. *Id.* at 544–54. Second, the timeline for evaluating insolvency in *HDD Rotary Sales* involved three points in time: (1)

established insolvency on January 1st; (2) established insolvency on December 31st; and (3) alleged

insolvency at the midpoint between those dates on June 30th. *Id.* at 549. It was therefore the court's

job to determine whether, based on two fixed points in time, it could infer insolvency six months

before and after those particular dates. *Id.*

Conversely, the points in time alleged by the Trustee here with respect to Animo's

insolvency are not only closer in time, but are also considerably higher in number in comparison.

Therefore, the Court has little trouble inferring insolvency for purposes of a motion to dismiss

where the Trustee has provided detailed allegations that Animo was insolvent both before and after

the transfers in question.

ii.   *Financial Vulnerability*

Even if the Court were to agree with Unqork with respect to insolvency, the Trustee has

also sufficiently alleged that Animo was financially vulnerable on the dates of the transfers in

question. Unqork's primary contention on this point is that the pattern of capital calls and

subsequent infusions by WPI into the Debtor prior to the transfer dates illustrates how Animo was

"financially stable throughout the period when it made the [t]ransfers, and no particular [t]ransfer

left the Debtor without insufficient capital." ECF No. 27 at 16 (internal quotations omitted). Thus,

whether the Trustee is alleging that either (1) Animo had unreasonably small capital to make the

transfers at issue or a result of making the same, or (2) Animo intended to incur or believed it

would incur debts beyond its ability to pay as such debts came due, Unqork argues the answer

essentially remains the same: Animo could not have plausibly been financially vulnerable because,

whenever it needed the requisite funds to pay its debts, WPI provided the necessary finding.

Again, much of what Unqork argues is inappropriate for a motion to dismiss and is better

served by fact determinations via discovery and expert testimony. The Defendant asks the Court

to hold that it is categorically implausible for a debtor to be financially vulnerable so long as an entity exists on-call to provide the debtor with sufficient funds to pay its debts. Unqork's dependence upon Animo's "ready access to millions of dollars in cash" contains two notable gaps in logic. ECF No. 33 at 7. First, relying upon the potentiality of funds from WPI infers that Animo, on its own, was set to engage in business with Unqork while retaining unreasonably small capital, unless WPI provided capital infusions.

Second, the rationale that Animo's access to WPI's funds, alongside WPI's repeated cash infusions, means that Animo could not be financially vulnerable resembles something dangerously close to the Gambler's Fallacy[3], in that WPI's past cash infusions somehow establish an irrefutable financial stability for the Debtor moving forward. The Court, however, cannot set such an ephemeral standard for what constitutes "vulnerability" at the pleading stage.

Unqork's position is even more troubling in the sense that it all too casually understates the alleged insolvency and/or financial vulnerability of WPI itself. Despite its contention that WPI's balance sheet is not "relevant" for purposes of establishing Animo's financial vulnerability, the Defendant has provided no legal basis for why it is wholly implausible for a debtor to be financially vulnerable when it is largely dependent on the funds provided by its allegedly insolvent parent company. *See* ECF No. 27 at 10 ("WPI is not the Debtor; its solvency is not relevant."). As Unqork readily admits in its Reply: "The Debtor (Animo) is inseparable from WPI." ECF No. 33 at 6. Taking the Defendant at its word, it is therefore at least plausible to the Court that a debtor, who almost entirely relies upon cash infusions from an allegedly insolvent parent entity to pay its debts, is financially vulnerable at the time of the transfers at issue.

---

[3] The gambler's fallacy is the "belief that the probability of a random event occurring in the future is influenced by previous instances of that type of event." The Decision Lab, https://thedecisionlab.com/biases/gamblers-fallacy (last visited March 5, 2026).

Therefore, the Court finds that the Trustee has plausibly alleged that Animo was insolvent and/or financially vulnerable on the dates of the transfers at issue, and therefore will DENY the Motion to Dismiss on these points.

### B.  Reasonably Equivalent Value

To establish a cause of action under either § 548 or TUFTA for constructive fraudulent transfer, the trustee "must demonstrate that the debtor received less than reasonably equivalent value in exchange for such transfer or obligation." *In re Hanover Corp.*, 310 F.3d 796, 799 (5th Cir. 2002) (quoting 11 U.S.C. § 548(a)(1)(B)(i)). As previously noted by this Court, "Reasonably equivalent value is not defined in the [Bankruptcy] Code." *With Purpose*, 2025 WL 1698694 at *21. However, § 24.004(d) of TUFTA defines "Reasonably Equivalent Value" to include, without limitation, "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." Tex. Bus. & Comm. Code § 24.004(d).

Although the definition of reasonably equivalent value may be conceptual, both the Bankruptcy Code and TUFTA provide that "'value' includes, but is not limited to, the satisfaction of an antecedent debt of the debtor." *In re Senior Care Ctrs., LLC*, Case No. 18-33967, Adv. Proc. No. 20-03182, 2023 WL 6519756, at *12 (Bankr. N.D. Tex. Mar. 24, 2023) (Jernigan, C.J.); *see also* 11 U.S.C. § 548(d)(2)(A) ("'[V]alue' means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."); Tex. Bus. & Comm. Code § 24.004(a) ("Value is given for a transfer . . . if, in exchange for the transfer . . . an antecedent debt is secured or satisfied . . . ."). Accordingly, under Fifth Circuit precedent, for "reasonably equivalent value" to be present, the debtor must have "received value that is substantially comparable to the worth of the

transferred property." *Stanley v. U.S. Bank Nat'l Ass'n.* (*In re TransTexas Gas Corp.*), 597 F.3d 298, 306 (5th Cir. 2010) (citation omitted) (internal quotations omitted).

The burden for showing a lack reasonably equivalent value "falls on the [t]rustee—the party seeking to avoid the [t]ransfer as a constructively fraudulent conveyance." *Senior Care Centers*, 2023 WL 6519756 at \*14. The Supreme Court of Texas has held that both "value" and "reasonably equivalent value" contain an "implicit requirement that the transfer confer some **direct or indirect economic benefit** to the debtor, as opposed to benefits conferred solely on a third party, transfers that are purely gratuitous and transactions that merely hold subjective value to the debtor or transferee." *Id.*; *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 574 (Tex. 2016) (emphasis in original). It is therefore a trustee's burden to show that a debtor "did not receive a direct or indirect benefit" in exchange for the transfers at issue. *Senior Care Centers*, 2023 WL 6519756 at \*14.; *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 574 (Tex. 2016). Finally, a court's determination of what constitutes "reasonably equivalent value" must be made "as of the time of the transfer, without the benefit of hindsight as to what actually transpired after the transfer that might have affected the value." *In re Topcor Inc.*, 54 Fed. App'x 405 (5th Cir. 2002).

Unqork's primary argument is that the Trustee failed to adequately plead a lack of reasonably equivalent value with respect to the transfers at issue, and instead attempts to "repackage and substitute breach of contract claims" for constructive fraudulent transfer claims. ECF No. 27 at 18–19. In other words, rather than plead any allegations that, at the time of the alleged transfers, the Debtor knew it was not receiving reasonably equivalent value in exchange, the Trustee instead focuses on Unqork's alleged breaches of the MSA, effectively arguing in "hindsight" with respect to the "value" given by Unqork to Animo. *Id.*

Unqork argues that the Complaint is further weakened when considering that the satisfaction or securing of a present or antecedent debt of the debtor, can constitute "value". *Id.* at 18. Unqork contends that the Debtor's "post-payment dissatisfaction with Unqork's performance under the MSA is irrelevant in the context of a fraudulent transfer claim," and that by "conceding" both the validity of the MSA and that the transfers at issue were "made on account of the antecedent debt owed thereunder," the Trustee has effectively "pleaded itself out of court." ECF No. 33 at 4.

In support of its position, Unqork argues that "where a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation." *Cox. v. Nostaw, Inc.* (*In re Cent. Ill. En. Coop.*), 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015). "Absent avoidance of the underlying contract, the payments discharge the obligation and are, by definition, for reasonably equivalent value." *Id.*

In response, the Trustee focuses primarily on the lack of value given by Unqork in exchange for approximately $2.9 million transferred by the Debtor. The Trustee maintains that the allegations highlighting Unqork's failure to develop and deliver completed versions of the Unqork Products pursuant to the MSA confirms that "Unqork's work product was unusable all along, from the time of the first [t]ransfer to the time of the last [t]ransfer." ECF No. 32 at 13. The Trustee additionally points out that, notwithstanding the language in § 548(d)(2), some bankruptcy courts have held that "whether a transfer is made pursuant to a contract is not necessarily dispositive of the issue." *See In re Grandparents.com, Inc.*, 614 B.R. 625, 632 (Bankr. S.D. Fla. 2020).

As noted by the Honorable Laurel Isicoff in *Grandparents.com*, if avoidance of the underlying contract was effectively a condition precedent to a fraudulent transfer claim involving a contract, "then any payment that is otherwise constructively or actually fraudulent would be

insulated by the [mere] existence of a contract." *Id.* Just like payment for services under a contract does not always bar a claim for breach of contract, "neither does it necessarily bar a claim for constructive fraud, *if* the plaintiff proves the elements of *that* cause of action." *Id*. at 632 (emphasis in original).

Much like its determination with respect to insolvency and/or financial vulnerability, the Court agrees with the Trustee for two reasons. First, from a procedural perspective, the Court agrees with the notion that a determination of whether a transfer was for reasonably equivalent value "is a fact intensive determination that typically requires testing through the discovery process." *In re Walter*, 462 B.R. 698, 709 (Bankr. N.D. Ia. 2011); *In re Charys Holding Co*., 443 B.R. 628, 638 (Bankr. D. Del. 2010). As noted by the court in *Agriprocessors* with respect to what a trustee is required to plead at the motion to dismiss stage, "The trustee must describe the consideration and why the value of such consideration was less than the amount transferred," to sufficiently meet the notice pleading standard. *In re Agriprocessors, Inc*., Case No. 08-2751, Adv. Proc. No. 10-09123, at *6 (Bankr. N.D. Ia. 2011). An allegation that a debtor received "nothing from the defendant in exchange for an alleged fraudulent transfer" is sufficient for pleading purposes. *Id.* at *9.

Here, the Complaint contains ample allegations that Animo did not receive "*any* value", let alone reasonably equivalent value, in exchange for the transfers at issue. ECF No. 25 at 2 (emphasis in original). At bottom, the Trustee's allegations revolve around the idea that, at all relevant points in time, the Unqork Products were defective and unfinished and, therefore, valueless. As provided in the above-referenced cases, allegations that roughly $2.9 million transferred by Animo to Unqork in exchange for what the Trustee contends were useless products are sufficient for purposes of a motion to dismiss.

The Court finds the Defendant's position to be a troubling prerequisite for plausibly alleging a constructive fraudulent transfer claim for purposes of a motion to dismiss. Conceptually, satisfaction of a contractual obligation constitutes reasonably equivalent value, in that one party's payment, according to the terms of a contract, ordinarily and reasonably equates to consideration. However, it is equally plausible to the Court that a constructively fraudulent transfer can still exist despite originating out of an otherwise valid contract. To adopt Unqork's position would be to narrow the definition of a transfer and broaden the definition of value. Such a standard would be plainly unworkable.

Moreover, the Court disagrees with Unqork's contention that the Trustee is utilizing the "benefit of hindsight in order to reframe contract claims as allegations which could establish a lack of reasonably equivalent value at the time of the transfers." ECF No. 27 at 5. All trustees review transactions based on hindsight; Chapter 5 of the Bankruptcy Code statutorily authorizes that level of scrutiny.

Here, the Trustee alleges that the Unqork Products, at all relevant points in time and particularly on the transfer dates, did not work at all, and, therefore, each transfer was inherently for less than reasonably equivalent value. Although Animo may not have possessed the full scope of how allegedly valueless the Unqork Products were until after the transfer dates when Animo's internal team was able to test the deliverables, such allegations are a far cry from a Trojan Horse breach of contract claim capitalizing on the benefit of hindsight. The transfers, at bottom, were allegedly valueless at the time they were made. The fact that the Trustee and the Debtor are bound by the laws of time and space—in that the only ability to determine the nature of a transfer at a past point in time is to, quite literally, look into the past—is not the same as a recharacterization of that transfer using the benefit of hindsight.

Accordingly, the Court finds that the Trustee has sufficiently pleaded that the transfers at issue were not for reasonably equivalent value and Unqork's Motion to Dismiss is DENIED on this basis.

**VI.** <u>**CONCLUSION**</u>

For the reasons set forth above, it is hereby

**ORDERED** that the Defendant's Motion to Dismiss is DENIED.

**### END OF ORDER ###**